<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HASSAN HAWKINS,<br>           *Defendant*. | Crim. No.: 00-323-05 (KSH)<br><br><u>**OPINION**</u> |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

      Hasson[1] Hawkins has applied to this Court for early termination of supervised release. His application is granted.

      In April 2002 Hawkins was convicted by a jury of trafficking powder cocaine and cocaine base. Under the then-mandatory sentencing guidelines, this Court granted a one-level departure based on Hawkins's role in the offense, and imposed a 360 month sentence at adjusted offense level 42, taking him out of the range of mandatory life, which starts at offense level 43. His three co-defendants all received life sentences.

      Hawkins's release date on that sentence was set by the Bureau of Prisons as December 9, 2026. On November 7, 2019, this Court resentenced Hawkins and his co-defendants Ronald Mack, Rodney Mack, and Jesse Opher under § 404 of the First Step Act to time served and five years of supervised release. Hawkins was released from custody the next day and began supervision in the Southern District of Florida. When he was resentenced, Hawkins calculated

---

[1] The Court uses the correct spelling of Mr. Hawkins's first name in the within opinion, noting that it is misspelled in the indictment and throughout various docket entries. To ensure that this Court's ruling herein is carried out, the caption will remain unchanged.

1

his time in federal custody as 19 years and 21 days. He has now been supervised for three years and his scheduled discharge date from supervision is November 7, 2024.

18 U.S.C. §3583(e)(1) provides that the court may, after considering the §3553(a) factors, terminate a term of supervised release after the expiration of one year "if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." The Third Circuit gives helpful guidance to district judges in *United States v. Melvin*, 978 F.3d 49 (3d Cir. 2020), which clarified that in applying §3583(e)(1) the court has discretion to consider a wide range of circumstances that need not be "exceptional, extraordinary, new, or unforeseen." *Id.* at 53.

Consistent with the release plan he submitted to United States Probation in his application for a reduced sentence, on his release Hawkins went to Sebring, Florida, to live in the residence owned by his sister Cheryl Peterson. In 2020, Ms. Peterson died unexpectedly. Hawkins's application for early termination is prompted by the decision made by his family – with whom he has been extraordinarily close throughout his incarceration and release – to sell his sister's house. According to his application, he is in full agreement; he is in a committed relationship and the couple is planning to marry and buy or rent a house. Accordingly, Hawkins has submitted an application to transfer his supervision to the Middle District of Florida so he can move to Jacksonville and pursue more lucrative employment, including building a box truck company with his future wife.

His attorney's supplemental submission represents that this plan is facing some obstacles, specifically the Middle District's requirement that Hawkins not live alone and that prior to any cohabitation, the couple either marry or his future wife establish a residence in Florida first. The

fallback arrangement that Hawkins has proposed would have him live in a spare bedroom in the family residence of his niece, her husband, and their teen-age daughter.

The government opposes Hawkins's application, arguing that he has not identified any changed circumstances and that compliance with supervised release is expected and not a basis for early termination. The government represents that short of the extreme modification of his remaining term by way of termination, it would not oppose modification that would permit him to travel or relocate subject to Court approval of his plans for same. (D.E. 603.) In continuing to oppose after defense counsel's more detailed supplemental submission explaining the Middle District of Florida's requirements (D.E. 607), the government repeats that the appropriate remedy is to modify his release conditions so that he may travel or relocate and "[t]hat way, the Court can address his concerns without ending supervision." (D.E. 609.)

According to the Probation Office in the Southern District of Florida, which has been providing supervision throughout, Hawkins has maintained steady employment, paid the $3,000 fine imposed when he was originally sentenced, tested negative for illegal substances, and complied with the special conditions of supervised release. His compliance has been such that that Office has no objection to termination of supervised release at this time. One could argue that the real experts on the contested issue of whether supervision should end – *i.e.*, the people who have supervised him for the past three years – have spoken.

The Court must nonetheless apply the specific §3553(a) factors identified in §3583(e),[2] which leads to the same conclusion: supervision can and should end. Taken as a whole, the identified factors are the familiar ones -- the nature and circumstances of the offense of conviction and the history and characteristics of the defendant; to afford adequate deterrence to

---

[2] These are §3553(a)(1), (2)(B)-(D), (4)-(7).

3

criminal conduct; to protect the public from further crimes by the defendant; and the need to provide the defendant with needed educational or vocational training medical care or other correctional treatment. Additional §3553(a) factors specified in §3583(e) are the sentences and sentencing ranges established in the sentencing guidelines; any pertinent policy statements issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities; and the need to provide restitution for victims.

When Hawkins was originally sentenced, the sentencing law was different, the guidelines were mandatory, and the §3553(a) factors were not part of the analysis. When he was resentenced, however, those factors were the driving force behind the Court's decision to reduce his sentence to time served, and the Court set forth in exhaustive detail why they supported immediate release after over 19 years in prison. (D.E. 596, 11/7/19 Tr. 177:1-182:10.) This begs the question of how to apply §3553(a) now, when what is at issue is not the remarkable event of a reduction in sentence, but rather the early termination of supervised release. Put another way, the application of those factors must be relevant and more than a robotic recitation of the Court's analysis at the resentencing. So the Court looks to Hawkins's life since November 7, 2019.

The Court is satisfied that since his release from prison, Hawkins has done more than merely comply with the terms of supervision as expected. This is not to say that there are "exceptional, extraordinary, new, or unforeseen" circumstances afoot. *Melvin* says these aren't required and Hawkins does not say that the sky is falling; rather he presents reasonable, day-to-day arguments that are quietly compelling. What strikes the Court is that for a man who spent almost 20 years in custody between the age of 27 and 47, Hawkins has reintegrated into society with purpose and grace. Supported by a family that never was far away in spirit while he served his time (albeit there were periods when he was transferred to prisons far away), he moved in

4

with his sister, maintained employment, and continued his active participation in his church by serving as a church custodian for two years, earning the warm regards of his pastor ("He was the best Custodian in attitude and work. He'd do almost anything for us. . . . He became a part of the family." (D.E. 607-1, App'x 2).)  He is in a committed relationship that began in November 2020 with the goal of marriage; his future wife is a Middlesex County Sheriff's Officer who intends to relocate to Florida and work in their planned business venture as a dispatcher while he drives a truck in their freight brokerage company, an outgrowth of his employment at Uber Eats that led him to look for more lucrative employment in a more populous area.

      This a natural progression when one is working steadily and has goals.  And what cannot be overlooked is that Hawkins's successful transition from prison to active participation in community life required that he perform all the mundane and critically necessary steps of getting his birth certificate, a driver's license, social security card, and opening bank accounts.  Nor can the steady unbroken support of his family members be minimized.  To comply with continued supervision in the Middle District of Florida, Hawkins's niece Jenna Simpson and her family are willing to take him in, and he will live in an extra room (no room for his future wife).  This will require life changes for all involved.   And family is willing, as the letter to the Court from Ms. Simpson indicates:  "With his potential move here, we have encountered some issues with the [Middle District of Florida] probation office.  While we are working to make the needed adjustments as to not halt his continued progress."  (D.E. 607-1, App'x 3.)  That commitment to her uncle speaks well of her and of what Hawkins means to his family members.

      Ms. Simpson highlights what is at stake: Hasson Hawkins's continued progress. From the Court's longitudinal knowledge of this case, there exists a continuum going back decades.

5

Hawkins engaged in a lengthy colloquy with the Court that reflects this when he was re-sentenced:

> I thank you for the opportunity to speak. I have been waiting 19 years to speak to you to just let you know who I was. And even back then I thought I knew who I was, but I didn't. And really I was lost. And I thank God I found myself throughout the time. And I wrote down a statement, so I wouldn't, you know, I would be able to give you everything for 19 years briefly. It has been 17 years since I was sentenced under the mandatory guidelines. Two years and four months since my mother passed. Thirteen years since my father passed. Today the day of my resentencing altogether it is 19 years and 21 days. And, yes, ma'am, it is a lot of years. And, yes, ma'am, it is a lot of time. And it is a whole lot of regrets and a lot of hurt that I feel. My biggest regret is not being there to help my parents as they battle cancer because they passed away. Of course there are more regrets or rather self-disgust of choices that I made when I was young, like missing out on the beauty of watching my kids grow up. . . .
>
> Nevertheless, I spoke to them two to three times a week and more if it was needed. . . .
>
> I know all I have accomplished in prison could not justify or wipe away the agony of me being in there physically. Like I always say, you must make it worth it. And I have a saying that [AFPD] Ms. Arkel always like. Do the time. Don't let the time do you. . . .
>
> Ultimately, I went on a campaign to better myself. I got my GED. My mother always asked me to. I tried. But when I got in here, as soon as I got the chance, I got it. Then I took college classes, and received an Associates Degree, Bachelors Degree all in religious studies, and my Master's Degree in Christian Counseling. I took like 138 classes I think it was. Prison implemented classes. Though they was ACE classes, to learn how to have a good career when I get home and build a business with my kids. I also took classes in history, religion, comprehensive education, and teaching, to be able to help my kids and others when I get home. I built a platform showing my kids, that no matter what cards you are dealt in life, that you need to always improve yourself and help others with what you have learned and what you have been through. Over the years, I have helped numerous inmates who couldn't read. So I taught them how to reach and improve themselves as a person. I took psychology classes to further myself and understand why I had a temper and the issues I was going through, which ultimately led me to be far more compassionate, forgiving; and I later became a suicide watch companion, while I helped others going through the most difficult times in their lives who were at at risk of self-harm while in prison.

(11/7/19 Tr. 158:8-161:7.)

In response to an inquiry from the Court about the suicide watch, Hawkins explained that a suicide watch companion sits outside a single person cell with a window and monitors the subject inmate inside.

> It depends on who the person is. You are required to take journal, or journal every 15 minutes, I got to report whatever I see. . . . Whatever he may be doing or she may be doing. Or he may be doing. So, as you are reporting it, if the suicide inmate talks to you, you can talk back. . . .
>
> You want to try and console them, make sure, you know, he knows that I'm not just here watching you. A lot of them would say, you are just another cop. You are just here trying make sure I don't do this or this. I would let them know, no, I'm here for your safety to make sure I could call them as quick as I could if you harm yourself. I'm here to talk to you, whatever you need. We might go over scriptures. It might be a different religion he might be in. No matter what it is, you are just there to help him and talk to him, but your main job is write down in the journal every 15 minutes what goes on. And I was explaining to Ms. Arkel one time when I have an inmate that was banging his head against the wall. I was trying to explain to him, like, you know, you are hurting yourself, Bro, so please stop. Of course, I had to call them and come. I also explained to him, Listen, when they come, I mean, you know, they just going by protocol. They are not just coming and just grabbing you regular. They are going to grab you, you know, shackle you down. You are going to have to go through a lot. So, that was the main thing with doing the suicide watch, which I did for quite a while.

(*Id.* at 161:22-163:2.)

Hawkins described other programs he participated in, including his position as choir director and as the youngest elder on the church counsel board and his role in ROPE, the community outreach program to help troubled youth.

> I have been elevating myself the best way I can for the last 19 years. And I know my parents got to see it before they pass. I would continue to do my best on the outside by, working with my brother and living with my sister in Florida. And working with the local ministries to spread what I have learned over many years.

(*Id.* at 165:4-9.)

He concluded:

And I just hope, if I could show anything through all of this is that don't just look at a person, you know, and say oh, because of what the mistakes he made, but look at the person truly who he is. And why did he make the mistake? *What did he do after he made the mistake? Did he stay that way or did he change? Did he*

*want to do better?* What, what is the whole thing. So, I thank you for at least letting me say that so I can make sure that it is known, it is more of us. And we are all trying to do something. And I did the best I could. . . . *I did the best I could then and I will do the best I could when I get out.* Thank you.

(*Id.* at 166:13-167:1 (emphasis added).)

On this very specific record the Court can ask, did Hasson Hawkins do what he said he would do when he got out? Easily answered, Yes. He went to Florida and worked with his brother and lived with his sister, engaging with and even working in his church, all just as he said. Now with his new plans, he looks to reach bigger goals as a husband and provider, and if the past is a predictor of the future, he intends to achieve them honorably. The Court is satisfied that continued supervision is not needed; Hawkins is employed, committed, contributing. Close and cautious supervision by a new district, with difficult adjustment demanded of both Hawkins and his supportive relatives and future wife, halts his progress and, it would appear, asks more of them than necessary.

The "parsimony clause" of §3553(a) that a sentence be "sufficient, but not greater than necessary" speaks loudly here. This record demonstrating Hawkins's conduct, the affirmative position taken by the Probation Office that has supervised him throughout, and the interest of justice warrant termination of this five year term of supervised release now, at the three years Hasson Hawkins has served.

His application for early termination of supervised release is granted, and an appropriate order will be entered.

Dated:  November 18, 2022                           /s/ Katharine S. Hayden
                                                    Katharine S. Hayden, U.S.D.J.

8